UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE


STEVE MOORE                          )
                                     )
v.                                   )          NO. 2:08-CV-06
                                     )
METROPOLITAN LIFE                    )
INSURANCE COMPANY, *ET AL.*          )


**MEMORANDUM OPINION**

This matter is before the Court on cross motions for Judgement on the Record, [Docs.

16, 18 and 20]. The plaintiff argues that the decision of Metropolitan Life Insurance Company

("MetLife") to terminate his benefits was arbitrary and capricious. The defendants argue that the

plaintiff's claim for relief should be dismissed because the decision to terminate the plaintiff's long-

term disability benefits under the plan's policy was not arbitrary or capricious. The matter is ripe

for decision.

I.      **BACKGROUND**

This Court has thoroughly reviewed the entire record, and it has determined that the

facts in Defendant MetLife's brief are an accurate and thorough summary of the facts set forth in

the Administrative Record. Those facts are as follows:

**The Plan**
Plaintiff was employed as a fire patroller[1] for Eastman Chemical Company
("Eastman"). Eastman maintains an LTD benefits plan for its eligible employees
(the "Plan"). (See Plan 00001-000087). The Manager of the Human Resources

_____

[1]As a fire patroller, Plaintiff's job duties [included] response to plant emergencies including: fires,
ambulance calls, accidental discharges, confined space and high angle rescue, and other type of industrial
emergencies reported on the 911 emergency phone. Additionally, a fire patroller maintains and inspects fire
protection equipment, and approves and signs safety permits. (AR 000394).

1

Division of Employee Benefits for Eastman is the Plan Administrator and MetLife is the Claims Administrator under the Plan. (Plan 000026). The Plan defines Disability as follows:

"Disability" means a condition fulfilling the following requirements:

(a) The condition results in a Participant's total and continual inability to engage in Gainful Work[2];

(b) Due to the condition, the Participant remains under the care of a licensed physician;

(c) …the Participant is receiving Appropriate Care and Treatment and complying with the requirements of such treatment;

(d) The Participant's condition is due to sickness or as a direct result of accidental injury and did not result from the Participant's participation in an insurrection, rebellion or riot, or the Participant's commission of a crime of which he is convicted in a court of law;

(e) …the Participant is (i) unable to perform Gainful Work for any employer in the Participant's Local Economy[3], and (ii) earn more than 60% of his or her pre-disability IASR[4]; and

(f) The condition:
(1) Has lasted for a continuous period of 26 weeks or more inclusive of time during which the Participant

---

[2]The fact that Plaintiff may not be able to perform his former duties as a fire patroller is irrelevant to MetLife's determination whether he is disabled under the Plan. Indeed, under the Plan[,] Gainful Work means paid employment for which a person is, or becomes, reasonably qualified by education, training, or experience, and which is more than transitory in nature, as determined by the Claims Administrator. (Plan 000007(a)).

[3]Under the terms of the Plan, Local Economy means the geographic area: (a) within which the Participant resides; and (b) which offers Gainful Work within a reasonable travel distance of the Participant's home. (Plan 000067).

[4]Under the terms of the Plan, IASR or "Insurance Annual Salary Rate" means: (a) for Employees who do not participate in a [Eastman] sales target incentive program, IASR means an employee's (weekly) rate in effect on a particular day multiplied by 52… (Plan 000085).

was an STD Recipient or he received WCIB . . .

(Plan 000066). To receive benefits under the Plan, a claimant must provide to MetLife at his expense, and subject to MetLife's satisfaction, documented proof of disability and evidence of continuing disability. (Plan 000019(a)). The Plan further provides that the Plan Administrator has discretion to determine eligibility for benefits under the Plan as follows:

> The Plan Administrator shall have all the authority that may be necessary or helpful to enable him to discharge his responsibilities with respect to the Plan. Without limiting the generality of the preceding sentence, the Plan Administrator shall have the exclusive right: to interpret the Plan (but not to modify or amend the Plan); to determine eligibility for Coverage; to determine eligibility for Benefits; to construe any ambiguous provision of the Plan; to correct any default, to supply any omission; to reconcile any inconsistency; and to decide any and all questions arising in the administration, interpretation, and application of the Plan (including, but not limited to deciding questions of fact).

> The Plan Administrator shall have full discretionary authority in all matters related to the discharge of his responsibilities and the exercise of his authority under the Plan including, without limitation, his construction of the terms of the Plan and his determination of eligibility for Coverage and Benefits. It is the intent of the Plan that the decisions of the Plan Administrator and his action with respect to the Plan shall be conclusive and binding upon all persons having or claiming to have any right or interest in or under the Plan and that no such decision or action shall be modified upon judicial review unless such decision or action is proven to be arbitrary or capricious.

> The Plan Administrator may delegate some or all of his authority under the Plan to any person or persons . . .

(Plan 000023(a), 000026, 000037). The Plan Administrator has delegated discretionary authority to determine eligibility for LTD benefits to MetLife, who is

-3-

the Claims Administrator for the Plan. (Plan 000026, 000037). As it pertains to the Claims Administrator, the Plan further provides:

> In processing Claims and appeals…the Claims administrator shall have the discretionary authority and control to make factual determinations and all of the discretionary authority and control of the Plan Administrator . . .

(Plan 000073). The LTD benefits provided under the Plan are funded by the general assets of Eastman, and in certain cases, by contributions from participants. (Plan 000023). Thus, MetLife is not liable for the payment of Plan benefits. (Id.).

## Plaintiff's Claim

Plaintiff worked as a fire patroller for Eastman until February 5, 2006. (AR 000378). Plaintiff applied for LTD benefits on or about May 9, 2006, and claimed that he was disabled due to chronic pain in his head, neck, and upper right extremity, as well as weakness and paresthesias associated with cervicalgia and cervical spondylosis, multilevel with facet arthropathy. (AR 000379, 000405-415). In conjunction with his LTD application, Plaintiff submitted records from two attending physicians: Dr. J. John Hollandsworth, M.D., a family practitioner; and Dr. John Marshall, M.D., a doctor specializing in pain management and physical medicine and rehabilitation.

Included in the records was an Attending Physician Statement from Dr. Hollandsworth dated April 3, 2006 (the "April 2006 H-APS"), in which Dr. Hollandsworth diagnosed Plaintiff with cervicalgia. (AR 000379). Dr. Hollandsworth opined Plaintiff was completely restricted from work, but stated that Plaintiff could sit intermittently, walk intermittently, and stand intermittently during an eight-hour workday. (AR 000380). He further opined that Plaintiff was restricted from climbing, twisting, bending, stooping, and reaching above shoulder level, that Plaintiff had no ability to lift or carry any weight, and that Plaintiff had no ability to perform repetitive movement such as fine finger movement, eye/hand movements and pushing/pulling movements with his right hand. Dr. Hollandsworth suggested that Plaintiff become involved in physical therapy and a pain management program. (Id.).

Plaintiff also submitted two Attending Physician Statements from Dr. Marshall respectively dated April 4, 2006 (the "April 2006 M-APS"), and June 18, 2006 (the "June 2006 M-APS"), wherein Dr. Marshall diagnosed Plaintiff with C6-7 disc protrusion secondary to cervical spondylosis. (AR 000355-357, 000382-384). Additionally, Dr. Marshall opined that Plaintiff should not perform tasks requiring lifting, pushing, pulling, or carrying more than 20 pounds, repetitive bending or twisting at the neck, static posturing of the neck, impact loading to the neck, ladder climbing, or repetitive above the shoulder reaching. However, Dr. Marshall opined that the above restrictions were temporary and could be removed or modified in four weeks. (AR 000382-384, 000390).

-4-

On or about July 12, 2006, MetLife approved Plaintiff's claim for LTD benefits, effective July 17, 2006, on the basis that his medical records supported a severity of functional impairment that would preclude Plaintiff from performing the essential duties of full-time job demands, given that he was purportedly unable to fit or carry any amount of weight, and had limited use of his right upper extremity. (AR 000005, 000386-387).[5]

Approximately three weeks after approving LTD benefits for Plaintiff, on or about August 1, 2006, MetLife received information from Eastman that it had received video information pertaining to Plaintiff's condition, and would be sending the same to MetLife for its review. (AR 000008). Thereafter, MetLife contacted Merrill Investigative Services ("Merrill") to conduct visual surveillance of Plaintiff to determine whether Plaintiff's purported functional limitations were accurate. (AR 000010).

On or about November 6, 2006, MetLife received a confidential investigative report from Merrill (the "Merrill Report"), which detailed Plaintiff's activities captured on video by Merrill during its surveillance of Plaintiff. The Merrill Report indicated Plaintiff had far greater functional capacity than Plaintiff expressed through his subjective complaints to his doctors, or than that which his attending physicians had attributed to him. (AR 000011, 000323-326). The Merrill Report indicated that on October 11, 16, 17 and 18, 2006, Plaintiff was observed on each of those days to drive his motor vehicle by himself and be absent from his home for at least one hour. (AR 000324).

The Merrill Report revealed that on October 18, 2006, Plaintiff was observed to carry cardboard boxes, large trash bags, a wooden papason chair and other large items, as well as the tailgate for his white Ford pick up truck, and place and/or throw them into the back of his truck. Additionally, Plaintiff was also observed to bend fully at the waist and hold the position while picking up items from the ground. (AR 000325). Later that same day, Plaintiff was observed to walk to his truck, pick up a large bag of dog food and hoist it onto his left shoulder. Plaintiff carried the dog food down to a small gated area and proceeded to feed a dog while bending down at the waist for an extended period of time then returning to an upright position. (Id.).

**Review of Plaintiff's Claim**

In light of the information contained within the Merrill Report, and pursuant to the terms of the Plan, MetLife initiated a review of Plaintiff's file to determine whether he continued to be totally unable to engage in Gainful Work as defined in the Plan. In conjunction with its review, on or about November 29, 2006, MetLife requested updated medical information, including office notes from June 2006

---

[5]Prior to applying for LTD benefits from Eastman, on or about May 8, 2006, Plaintiff completed his application (the "SSDIB Claim"), with the Social Security Administration for Disability Insurance Benefits. (AR 000329-335). By letter dated October 12, 2006, Plaintiff received notice from the Social Security Administration they had denied his SSDIB Claim on the basis that his health problems did not qualify him for benefits. (AR 000317-319).

through November 2006, as well as the results of any recent tests conducted on Plaintiff, from both Drs. Hollandsworth and Marshall. (AR 000013). MetLife also requested that Dr. Marshall complete a Physical Capacities Evaluation pertaining to Plaintiff's then current level of functionality. (AR 000014, 000312).

In response, Dr. Marshall did not provide a current Physical Capacities Evaluation. Instead, Dr. Marshall simply attached a Medical Evaluation Report dated June 23, 2006, which contained identical restrictions and limitations as opined to by Dr. Marshall in his June 2006 M-APS and April 2006 M-APS, except the restrictions were now labeled "permanent", and Dr. Marshall indicated Plaintiff was at maximum medical improvement. Dr. Marshall provided [no] explanation for the change in his assessment. (AR 000314). Additionally, Dr. Marshall provided one office note dated September 12, 2006, wherein he diagnosed Plaintiff with cervical spondylosis, multilevel with facet arthopathy, and osteoarthritis of the knee. (AR 000315). Although Plaintiff made subjective complaints on that date regarding pain in his lower back and lower left extremity, upon physical examination, Dr. Marshall noted that Plaintiff's motor, sensory and deep tendon reflexes were stable in the upper and lower extremities, and reported that Plaintiff's straight leg raise and fabere tests were both negative. (Id.).

On or about December 8, 2006, MetLife received an Attending Physician Statement dated November 30, 2006 (the "November 2006 H-APS") from Dr. Hollandsworth, wherein Dr. Hollandsworth diagnosed Plaintiff with cervicalgia secondary to Transient Ischemic Attack ("TIA" )(a transient stroke that lasts only a few minutes, the symptoms of which can include: numbness or weakness in the face, arm, or leg, especially on one side of the body; confusion or difficulty in talking or understanding speech; trouble seeing in one or both eyes; and difficulty with walking, dizziness, or loss of balance and coordination)[6], and claimed that objective tests, including a brain MRI, Carotid Doppler and a Stress Test all supported these diagnoses. (AR 000262). However, interestingly, the results of a VAS Carotid Doppler-Bilateral Ultrasound conducted October 19, 2006, were normal and showed there was no significant stenosis bilaterally. The results of an MRI of Plaintiff's brain, also conducted October 19, 2006, showed Plaintiff to have - apart from mucous retention cysts of the maxillary sinuses - a normal brain. (AR 000275-278). The NM Adenosine Cardiolite Test, conducted August 4, 2006, proved to be normal with no evidence of myocardial infarction or adenosine-induced ischemia. (AR 000299-300). The Stress Test Cardiolite, conducted August 4, 2006, also had normal results, with no evidence of arrhythmias, or significant ST segment changes. (AR 000302-303).

In regard to Plaintiff's physical capabilities, Dr. Hollandsworth opined that Plaintiff could sit, stand and or walk intermittently, could not climb, twist, bend,

---

[6]See "What is a Transient Ischemic Attack?", The National Institute of Neurological Disorders and Stroke, (http://www.ninds.nih.gov/disorders/tia/tia.htm).

stoop or reach above shoulder level, nor could he conduct repetitive fine finger movement, eye/hand movement or pushing/pulling movements with his right hand. (AR 000263). As it pertained to Plaintiff's psychological functions, Dr. Hollandsworth opined that Plaintiff was unable to engage in stress situations and engage in interpersonal relations. (AR 000263). Dr. Hollandsworth opined Plaintiff could work zero hours per day and that he did not expect any improvement in Plaintiff's capabilities. (Id.). Dr Hollandsworth did no[t] offer any explanation for the basis for the imposed restrictions.

Dr. Hollandsworth also submitted records from several office visits with Plaintiff, including, but not limited to, one dated October 16, 2006, wherein Dr. Hollandsworth noted Plaintiff's subjective complaints of continued pain in his head, neck and extremities, and of sudden onset weakness and numbness, but without any cognition, speech, vision, hearing or facial problems. (AR 000273).

Dr. Hollandsworth submitted the results of a Functional Capacity Evaluation conducted on Plaintiff on January 13, 2005 (the "2005 FCE").[7] The 2005 FCE, which was conducted by Alan Meade, P.T., MPG ("PT Meade"), revealed that Plaintiff had good lumbar, cervical, upper extremity and lower extremity range of motion, that Plaintiff's muscle strength was 5/5 in both upper and lower extremities, and that Plaintiff was capable of performing activities requiring heavy physical demand of work. (AR 000280-287). Dr. Hollandsworth also submitted the results of a nerve conduction study conduced in December of 2005, which showed normal results, with no evidence of radiculopathy or neuropathy. (AR 000289).

In light of the lack of objective clinical evidence supporting Plaintiff's alleged functional limitations, and in light of the information provided through the Merrill Report and accompanying surveillance video (the "Surveillance Video"), by letter dated January 11, 2007, MetLife requested that Dr. Hollandsworth re-evaluate Plaintiff's functional limitations, and enclosed a copy of the Surveillance Video for Dr. Hollandsworth's review. MetLife specifically requested that Dr. Hollandsworth clarify the inconsistencies noted between Plaintiff's subjective complaints in the office visit dated October 16, 2006, and his exhibited physical capabilities noted in the Surveillance Video, which was made only two days after the October 16 office visit. (AR 000020, 000253). MetLife further requested that Dr. Hollandsworth: (1) identify the physical condition then currently preventing Plaintiff from returning to work in any capacity; (2) identify the then current functional restrictions/limitations based on clinical evidence, including specific documentation regarding deficits with Plaintiff's range of motion and strength, and any testing used to confirm Plaintiff's subjective complaints of numbness and weakness; and (3) comment on the level of activity as viewed on the Surveillance Video. (AR 000253). MetLife advised Dr. Hollandsworth that if it did not receive a response by January 26, 2007, MetLife would assume Plaintiff was not disabled from return to work in some capacity, given

_____

[7]Given that Plaintiff seems to contend that his alleged conditions are related to an on-the-job injury he sustained in May of 2004, wherein he fractured his right radial head, the 2005 FCE is significant in that it was conducted subsequent to the alleged disabling injuries. (AR 000280).

-7-

his functionality demonstrated in the Surveillance Video. (AR 000253). Dr. Hollandsworth did not respond to MetLife's request. (AR 000250).

Accordingly, by letter dated February 2, 2007, MetLife terminated Plaintiff's LTD benefits effective February 5, 2007, on the basis that there was no clinical evidence which would support an assessment that Plaintiff was totally and continually prevented from performing Gainful Work. (AR 000251). MetLife advised Plaintiff of his right to appeal MetLife's decision, and to submit any additional comments, documents, records, or other information relating to his claim that he deemed appropriate for MetLife to review in order to give any appeal proper consideration. (AR 000250-252).

**Plaintiff's Appeal**

On February 19, 2007, Plaintiff contacted MetLife by telephone, and indicated that he intended to appeal MetLife's decision to terminate his LTD benefits. (AR 000024). He further indicated he would forward additional information to MetLife for consideration in conjunction with his appeal. (Id.)

Soon thereafter, Plaintiff submitted a Physical Therapy Initial Evaluation conducted by PT Meade on February 5, 2007 (the "February 2007 PTE"), and which was signed off on by Dr. Hollandsworth.[8] PT Meade opined that Plaintiff could sit zero to two hours in an eight-hour period, assuming he was able to change positions throughout the day, but could only sit at one setting for thirty minutes or less. He opined Plaintiff could stand zero to two hours in an eighthour period, assuming he was able to change positions throughout the day, but could specifically stand at one setting for only fifteen minutes or less. He opined Plaintiff could walk less than a quarter of a mile on the average per day, and that he could drive for short distances only. PT Meade opined that Plaintiff could not reach or lift with his right arm, but could reach with his left arm. Notably, PT Meade opined that Plaintiff ***could perform sedentary work with occasional lifting with the left arm of no more than ten pounds***. Additionally, objective tests purportedly showed Plaintiff to have 5/5 muscle strength in his left arm, 3-/5 muscle strength in his right arm, 4-/5 muscle strength in his right elbow, trunk flex extension muscle strength of 4/5, right leg extension muscle strength of 5/5, and left leg extension muscle strength of 4/5. (AR 000246-247).

On February 19, 2007, in response to MetLife's request that Dr. Hollandsworth provide specific documentation and test results pertaining to Plaintiff's alleged conditions that would support the functional limitations under which Plaintiff allegedly suffered as set forth in the November 2006 H-APS, Dr. Hollandsworth submitted the November 2006 H-APS, the February 2007 PTE, and notes taken during a physical exam dated February 9, 2007. (AR 000233-244).

By letter dated March 8, 2007, Dr. Hollandsworth contacted MetLife and

---

[8]Mr. Moore's wife, Kim, is apparently employed by the same facility, Holston Medical Group, where Dr. Hollandsworth maintains his practice and which conducted the 2005 FCE and the February 2007 Physical Therapy Initial Evaluation. (AR 000246-248).

-8-

responded that he did not have any further opinions regarding the matter, other than his previously submitted Functional Capacity Evaluation.[9] (AR 000230). He further stated that he could not verify the authenticity of the Surveillance Video, and that as a group, his office did not make judgments based on videos, but rather on what an office visit reveals. (Id.).

By letter dated March 12, 2007, Plaintiff indicated in writing his desire to appeal MetLife's determination regarding his LTD benefits. (AR 000209). In conjunction with his appeal, Plaintiff submitted additional documents and information, including: information he obtained from the internet regarding his purported medical condition of Reflex Sympathetic Dystrophy ("RSD")(a chronic neurological syndrome characterized by: severe burning pain; pathological changes in bone and skin; excessive sweating; tissue swelling; and extreme sensitivity to touch)[10]; a letter from Dr. Hollandsworth dated March 29, 2006 (the "March 29 Letter); and notes from an office visit with Dr. Marshall dated March 8, 2007. (AR 000208-229).

In the March 29 Letter, Dr. Hollandsworth listed Plaintiff's purported medical conditions, asserted that Plaintiff would benefit from hydrotherapy, and asserted that a device such as a hot tub would be medically indicated and therapeutic for Plaintiff's medical conditions. (AR 000219).

The notes from the March 8, 2007 office visit indicate that ***Dr. Marshall had placed Plaintiff on light duty with a twenty-pound lifting limit***, and reflect that Dr. Marshall informed Plaintiff during the visit that Plaintiff was capable of performing activities within the restrictions he had assigned. Dr. Marshall further noted that he did not know the circumstances around the disability issue, that he considered the Plaintiff stable, physically, and ordered a recheck of Plaintiff after nine months. (AR 000214-215).

On or about March 27, 2007, MetLife referred Plaintiff's claim file, including all his medical records, to an independent physician consultant, Dr. Dennis S. Gordon, MD, a Fellow of the American Academy of Physical Medicine and Rehabilitation, Board Certified in Physical Medicine and Rehabilitation, and in Internal Medicine, for review. (AR 000203-205). Dr. Gordon was asked to evaluate: (1) whether the medical information supported functional limitations in Plaintiff from February 2, 2007 to the present; (2) what the February 7 PTE revealed regarding Plaintiff's ability to function; (3) whether the medications or dosages the Plaintiff was prescribed as of February 7, 2007 would cause functional or safety risks for the Plaintiff; (4) whether the medication prescribed was necessary for his condition; and (5) what the Surveillance Video revealed regarding the Plaintiff's

---

[9] It is unclear whether Dr. Hollandsworth was referring to the February 2007 PTE, the November 2006 H-APS, the April 2006 H-APS, or the 2005 FCE.

[10] *See "What is RSD?"*, The Reflex Dystrophy Syndrome Association, (http://www.rsds.org/2/what_is_rsd_crps/index.html).

ability to function, and whether the Plaintiff's activities as observed on the Surveillance Video were consistent with the February 2007 PTE. (AR 000191-202).

As part of his analysis of the medical documentation, Dr. Gordon reviewed myriad medical records and information, dating from October of 2000 through March 8, 2007. (AR 000191-196).

In conjunction with his analysis, independent physician consultant Dr. Gordon noted that although the Plaintiff claimed to have fractured both radial heads, office notes from May of 2004 indicated that only the right arm had been x-rayed, and there was no direct confirmation of any alleged left radial head fracture. (AR 000192). Plaintiff's right arm was cast, Plaintiff was referred to occupational therapy, and was allowed to return to work from mid August until September 4, 2004. (Id.). Dr. Gordon noted that an upper extremity electrodiagnostic test conducted on December 9, 2004 showed normal results. (AR 000155). He further noted that at the time the 2005 FCE was conducted, Plaintiff reported a steady level three pain in his elbow, which did not worsen with activity. On examination, Plaintiff's strength was normal throughout, with good balance. His reflexes, straight leg raises, posture, gait and stressed gait were all normal. (Id.). His range of motion included lumbar flexion of ninety-nine degrees, extension of forty degrees, side bending of forty degrees, and normal rotations. The neck, lower extremities, and upper extremities were normal except for the right elbow, with range from five to one hundred and twenty-one degrees versus the left elbow range, with range from zero to one hundred twenty-seven degrees. Strength testing, which included material handling, showed normal strength. Plaintiff was felt to be capable of heavy physical demand work at that time including his former fire patroller work. (AR 000155).

Dr. Gordon noted that there was then a gap in the records until December 23, 2005, at which time Plaintiff saw Dr. Marshall on referral from Dr. Hollandsworth, and noted that although a previous MRI reportedly had shown multilevel spondylosis and facet arthropathy without any cord or root compression, Plaintiff's physical exam by Dr. Marshall was remarkable only for a stiffly held neck, with pain on motion, some paraspinal soreness, and the right hand tremor during strength testing. (AR 000155). Dr Marshall's impression was that Plaintiff suffered from cervical spondylosis and facet arthopathy, with no major features of RSD. Dr. Gordon noted that Dr. Marshall referred Plaintiff to physical therapy, but in a January 5, 2006 office note, Dr. Marshall noted that ***Plaintiff had decided not to go to physical therapy***, and instead had decided to see a chiropractor and a neurosurgeon. Accordingly, Dr. Marshall signed off Plaintiff's case temporarily. (AR 000193).

Dr. Gordon also considered the notes from Dr. Corradino, a neurosurgeon, made on February 3, 2006, wherein Dr. Corradino reported a cervical myelogram and CT scan showed a small left-sided disc protrusion at C6-7, mild left C4-5, and moderate C3-4, foraminal narrowing, but noted that none of these objective tests revealed the compression of any neurological structures. (AR 000156, 000193). Dr. Gordon noted that Dr. Corradino felt that Plaintiff had headaches and neck pain associated with mild cervical spondylosis, which would be amenable to conservative treatment, or if necessary, epidural steroid injections. (Id.). Dr. Corradino thought

-10-

Plaintiff should have a neurological evaluation and an MRI of the brain for evaluation of the headaches, and continued Plaintiff's work restrictions. (Id.).

Dr. Gordon considered office visit notes from Dr. Hollandsworth dated February 14, 2006, which indicated that Plaintiff was complaining of increased pain and arm pain, and indicated Plaintiff informed Dr. Hollandsworth he had been diagnosed as RSD. Although there is no evidence in the record to support either the diagnosis of RSD or depression, Dr. Hollandsworth apparently accepted (based solely on the Plaintiff's subjective complaints), RSD as a diagnosis, along with situational depression, started the Plaintiff on Cymbalta, and referred Plaintiff to psychiatry. (AR 000193).

Dr. Gordon noted that notes from a visit to Dr. Marshall dated February 17, 2006 indicated that a brain MRI was conducted on Plaintiff, and revealed nothing more than incidental sinusitis. (Id.).

Dr. Gordon considered records which showed Plaintiff had epidural steroid injections for his neck and right upper extremity pain in February and April of 2006, the second of which was purportedly unsuccessful, and also considered the April 2006 H-APS from Dr. Hollandsworth, which indicated that Plaintiff was class four psychologically, and which placed severe restrictions on Plaintiff as it pertained to his job. (AR 000194).

Dr. Gordon noted that because of the alleged failure of the second epidural, Dr. Marshall conducted additional electrodiagnostic testing on Plaintiff on May 12, 2006, which revealed normal and unchanged results from the previous study, and revealed no basis for Plaintiff's complaints of increased pain. Apparently, at that time, Plaintiff reported to Dr. Marshall that his physical restrictions had been made permanent by his employer, Eastman, and that therefore, he wanted Dr. Marshall to listed the same restrictions on his medical evaluation report. (Id.). Dr. Gordon further noted although Plaintiff reported that his left knee had been bothering him, upon examination, aside from some crepitus on extension, the knee was normal. Dr. Gordon also specifically noted that in Dr. Marshall's impression, Plaintiff's alleged RSD was only possible, and was only being considered because of the Plaintiff's repeated assertions that he had been diagnosed with the same. (Id.)

Dr. Gordon noted that in early June of 2006, Dr. Hollandsworth noted Plaintiff reported his left leg to be worse from the knee down, and Plaintiff had started using a cane. However, like Dr. Marshall, upon examination, Dr. Hollandsworth found Plaintiff's knee to be normal. (AR 000194). Dr. Gordon also considered that approximately four days after his visit with Dr. Hollandsworth, Plaintiff called Dr. Hollandsworth's office complaining of chest pain off and on. An adenosine cardiac stress test was conducted, and all results showed to be normal. (Id.).

Dr. Gordon considered office notes from a visit with Dr. Marshall dated September 12, 2006, wherein Dr. Marshall noted Plaintiff's subjective complaints of somewhat new low back pain and left lower extremity complaints. However, Dr. Marshall's physical examination of the Plaintiff revealed nothing new. (AR 000194).

Dr. Gordon considered records from Dr. Hollandsworth's' office relating to

-11-

Plaintiff's complaints of insomnia which occurred during September of 2006. Specifically, in an office visit note dated October 16, 2006, Dr. Hollandsworth noted Plaintiff's subjective complaints of multiple pains, purportedly worse in cold weather, and three alleged episodes of left lower extremity weakness and numbness. However, the results of physical examination conducted by Dr. Hollandsworth showed Plaintiff's condition to be unchanged. (AR 000195). Dr. Hollandsworth's impression at that time was TIA. Dr. Hollandsworth requested an MRI of the brain, a neurology consultation, and a carotid Doppler. The results of the Doppler revealed no significant stenosis, and the MRI of the brain again revealed nothing more than incidental sinusitis. (Id.).

Dr. Gordon considered the Merrill Report and Surveillance Video, noted that Plaintiff was under surveillance October 11, 16, 17 and 18 of 2006, and noted that during that time, Plaintiff loaded various items into the back of his pickup truck, including bags of garbage, large cardboard boxes and other items, using both hands without any apparent problem. Dr. Gordon also noted that Plaintiff carried his pickup truck tailgate out to the pickup truck and appeared to hold it in place and attach it to the truck. Other observed activities included walking and driving, carrying a large bag of dog food, and bending over at the waist while holding the large bag while he fed his dog. (AR 000195).

Dr. Gordon considered the November 2006 H-APS from Dr. Hollandsworth wherein Dr. Hollandsworth indicted Plaintiff had a diagnosis of TIA and cervicalgia. Dr. Gordon considered that Plaintiff made subjective complaints of the sudden onset of left upper and lower extremity weakness and numbness, and that in turn, Dr. Hollandsworth referred Plaintiff to a neurologist. Dr. Gordon noted that Dr. Hollandsworth opined that Plaintiff's functional capabilities were continued limited, but that the reason Plaintiff could not work at that time was the sudden onset of the alleged left limb weakness and numbness. (AR 000195).

Dr. Gordon considered the February 2007 PTE conducted by PT Meade, wherein it was noted Plaintiff claimed he was sleeping a great deal, and wherein Plaintiff reported to the physical therapist that he was disabled. Dr. Gordon noted Plaintiff was at that time taking Depakote, Ambien, Lortab, Utltram, Cymbalta, Diclofenac, Nexium and vitamins. Dr. Gordon noted that physical exam results demonstrated decreased cervical range of motion and right should[er] motion, with a weak grip on the right side, despite the reported left upper extremity weakness. Dr. Gordon noted that Plaintiff's right upper extremity strength was alleged to be 3-/5, with elbow flexion of 4-/5, and left lower extremity, trunk flexions and extension of 4/5. Dr Gordon noted that the February 2007 PTE indicated limited capacities to do most activities, but that it was unclear whether the limitations were derived from testing or the Plaintiff's subjective complaints. (AR 000195). Dr. Gordon considered a physical exam conducted on Plaintiff by Dr. Hollandsworth on February 9, 2007, the results of which were normal except for a resting tremor in the right upper extremity. (AR 000195-196).

Finally, Dr. Gordon considered a note from Dr. Marshall dated March 8, 2007 which indicated that he considered the Plaintiff stable physically, that he had

-12-

released the Plaintiff to light duty with a twenty-pound lifting limit, that Plaintiff had been given Depakote for headaches, that the Plaintiff was using a Jacuzzi to good avail, and was purportedly using a transcutaneous electrical nerve stimulator (a "TENS") intermittently. (AR 000196).

Based on his analysis of the entire claim file, Dr. Gordon opined that although the verbiage of the physical therapy evaluations and functional capacity evaluations would support limitations, the reliability of the testing was in question. The records revealed there was a negative workup for stroke or source of TIA, and there was no clinical evidence of TIA, nor any evidence whatsoever for RSD. Indeed, Dr. Gordon opined that RSD appears to be something reported only by the Plaintiff himself. Additionally, Dr. Gordon opined there was no physical basis for Plaintiff's subjective complaints of the alleged left extremity weakness and paresthesia, and that Plaintiff's cervical disc herniation was on the wrong side to give rise to the same. Moreover, although testing on February 5, 2007 reported a 3-/5 weakness in his right arm, such a weakness would indicate an inability to even lift the arm from the side, which was contradicted by the Surveillance Video. (AR 000159). Dr. Gordon concurred with Drs. Marshall's and Corradino's notes that Plaintiff's orthopedic neck problems were not significant, and noted that the myofacial pain syndrome diagnosis was unsupported by any specific exam. (Id.).

Dr. Gordon concluded that although the Plaintiff had some degenerative changes in his neck, the changes were nothing out of the ordinary for someone of Plaintiff's age. Dr. Gordon further concluded that Plaintiff was completely functional in the 2005 FCE, which was conducted subsequent to his radial head fracture, and that there was no organic reason why Plaintiff would have worsened between the 2005 FCE and his next Functional Capacity Evaluation. (AR 000196). Dr. Gordon opined that he did not feel the February 2007 PTE to be a reliable test, as there was absolutely no indication whether many of the limitations or restrictions were based on objective or subjective reports, and there was no validity testing. Moreover the results of the February 2007 PTE were not consistent with the clinical findings contained in Plaintiff's medical records. (AR 000197).

As it pertained to the effects of his medications on Plaintiff's functionality, Dr. Gordon opined that Plaintiff's medications might potentially cause functional safety risks, and that he would therefore advise that Plaintiff not work around moving machinery, at unprotected heights, or other dangerous situations. (AR 000197). Dr. Gordon also specifically noted that despite his medications and their potential side effects, Plaintiff continued to drive. (Id.).

As it pertained to the necessity of Plaintiff's medications, Dr. Gordon opined that based on the objective evidence in the record, it appeared the Plaintiff was overreacting to his physical condition, and that in turn, his physicians were reacting to Plaintiff's subjective complaints. (Id.). Finally, Dr. Gordon opined that the activities in which Plaintiff was observed to engage on the Surveillance Video were not consistent with any of his functional capacity assessments, and certainly, Plaintiff's ability to lift bags and other objects with either arm was inconsistent with his purported weakness in his upper extremities. (AR 000197). Additionally, Dr.

-13-

Gordon opined that Plaintiff's ability to drive was not consistent with any alleged impairment of his alertness, and his ability to bend forward as demonstrated several times on the Surveillance Video was inconsistent with the range of motion noted in the February 2007 PTE. (AR 000197).

On or about April 12, 2007, MetLife faxed and mailed Dr. Gordon's report to Drs. Hollandsworth and Marshall for their review and comment. (AR 000034).

On April 17, 2007, an assistant from Dr. Hollandsworth's office contacted MetLife and confirmed that Dr. Hollandsworth did not diagnose Plaintiff with RSD, but instead, that it was Plaintiff who reported he had RSD. The assistant further advised that Dr. Hollandsworth stated that Dr. Gordon's report did not change his opinion as to Plaintiff's functional capabilities, that he has to believe what is in Plaintiff's records and the symptoms exhibited by Plaintiff when in his office, and that he could not comment on the Surveillance Video because he could not verify the validity of the same. (AR 000035).

In an addendum to his report dated April 17, 2007, Dr. Gordon recounted a conversation with Lorraine, the compliance officer at Dr. Hollandsworth's office, wherein she relayed the same information set forth above. Dr. Gordon stated, however, that there was nothing in his conversation with Lorraine that would alter his previous conclusions regarding Plaintiff. (AR 000166).

Dr Marshall confirmed his receipt of Dr. Gordon's report on April 17, 2007, and stated he had nothing to add to Plaintiff's medical records. (AR 000167).

On or about April 20, 2007, Plaintiff submitted additional medical information to MetLife, including, but not limited to, previously unseen records from Drs. Krein, Hollandsworth, and Dew, as well as notes from Plaintiff's employer's medical department. (AR 000059-63). MetLife forwarded all information received from the Plaintiff to Dr. Gordon for his review and comment. (AR 000036).

In response, on May 1, 2007, Dr. Gordon submitted an addendum to his report, wherein he discussed in detail all previously unseen records. (AR 000060-63).

Dr. Gordon considered records from Dr. Krein from May and November of 2004, and noted that the diagnoses of RSD was only suspected by Dr. Krein, and was never confirmed by any subsequent treating physician. (AR 000062).

Dr. Gordon considered test results and records from Plaintiff's office visits with Dr.Hollandsworth from December 2005 and February 2006, which indicated Dr. Hollandsworth simply accepted Plaintiff's assertion that he had been diagnosed with RSD. (AR 000060).

Dr. Gordon considered notes from visits with Dr. Dew, a neurologist, dated December 6, 2006[,] and January 29, 2007[,] relating to Plaintiff's complaints of numbness, chronic headaches and right arm pain, and which seemingly rejected a diagnosis of RSD. (AR 000061-62).

Finally, Dr. Gordon considered handwritten notes from Eastman's Medical Department dating from December 10, 2000[,] through June 13, 2006, which offered little to nothing as it pertained to Plaintiff's physical capabilities. (AR 000062).

Notably, Dr. Gordon summarized that although there was some evidence of mild decrease in elbow range of motion, otherwise, the diagnosis of cervical disc

-14-

protrusion, TIA and RSD were clearly in error. (AR 000063). Dr. Gordon further opined that the cervical degenerative changes were not clearly impairing, and the back and neck pain about which Plaintiff made subjective complaints were greater than one would expect on the basis of the objective clinical findings, were probably magnified by the Plaintiff's reported depression, and clearly did not impair the employee. (AR 000047-63).

Accordingly, after review of all medical evidence submitted by Plaintiff, by letter dated May 8, 2007, MetLife upheld its decision to terminate Plaintiff's LTD benefits on the basis that review of the information submitted by Plaintiff on appeal, along with the information on record with MetLife, was insufficient to support a severity of impairment or of symptoms that would prevent Plaintiff from performing Gainful Work as of February 2, 2007. (AR 000040-44). This suit followed.

(MetLife's Memorandum in Support of Motion for Judgment on the Administrative Record, pages 2-22) (emphasis in original).

## II.   ANALYSIS

As stated above, the plaintiff raises numerous issues in his motion for judgment on the administrative record at to why he contends the defendants acted arbitrarily and capriciously in denying his long-term disability benefits. The defendants simply argue that the decision to deny benefits was not arbitrary and capricious. This Court will discuss the issues in turn.

First, the Court notes that the plaintiff filed his motion four months past the deadline set forth in this Court's Scheduling Order for doing so. In addition, the plaintiff did not seek leave of Court to file the late motion. MetLife argues that this Court should strike the plaintiff's motion as untimely and that plaintiff's failure to respond is grounds for granting the motion as unopposed. Similarly, the Eastman defendants argue that the plaintiff's motion should be denied as untimely because the plaintiff did not seek permission to file the motion outside the deadline set forth in the Scheduling Order, failed to show good cause for modifying the order to allow for the filing, and failed to show that the defendants would not be prejudiced because of the late-filing. The Eastman defendants also argue that its motion should be granted as unopposed.

-15-

It is true that Federal Rule of Civil Procedure 16(b)(3)(A) requires the Court to enter a scheduling order and that subsection (b)(4) provides that such order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(3) and (4). Further, "a determination of potential prejudice to the nonmovant is required when a district court decides whether or not to amend a scheduling order." *Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003). Here, the plaintiff did not even seek permission from this Court to late-file the motion, much less show good cause.[11] In addition, this Court determines that there is a potential for prejudice to the defendants. Accordingly, this Court could strike the motion as untimely.

The defendants' also argue that their motions should be granted as unopposed, without considering the merits of the motions, because the plaintiff failed to file responses. If a party does not respond to a motion for summary judgment, the Federal Rules of Civil Procedure provide that "summary judgment, if appropriate, shall be entered against him." Fed.R.Civ.P. 56(e). The fact that plaintiff did not respond does not automatically require granting defendants' motions. Moreover, "[i]f a moving party fails to carry its initial burden of production, the non-moving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion." *Hunter v. Caliber System, Inc.*, 220 F.3d 702, 726 (6th Cir. 2000) (quoting *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102-03 (9th Cir.2000)). Nonetheless, if the allegations of the complaint are contravened by defendants' evidence and defendants are entitled to judgment as a matter of law on those facts, then summary judgment is appropriate. *Smith v. Hudson*, 600 F.2d 60, 65 (6th Cir.1979).

---

[11]The plaintiff also did not file a reply to the defendants' responses regarding the untimeliness of the motion.

Here, even considering the plaintiff's arguments, which this Court is not required to do because they are untimely, this Court FINDS that the allegations in the complaint are contravened by the defendants' evidence, and the defendants did not act arbitrarily or capriciously in denying the plaintiff's long-term disability benefits. The merits of the issues are discussed below.

## A. Standard of Review

When, as is the case here, the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits, this Court will reverse the administrator's decision only if it is arbitrary or capricious. *Gismondi v. United Techs. Corp.*, 408 F.3d 295, 298 (6th Cir. 2005). Under this standard, this Court upholds the administrator's decision "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006) (internal quotation marks omitted), *aff'd*, 128 S. Ct. 2343 (2008) (upholding decision solely regarding conflict-of-interest issues; *certiorari* only granted as to that issue). Although this standard is deferential, it "is no mere formality." *Id*. "The arbitrary-and-capricious standard . . . does not require [this Court] merely to rubber stamp the administrator's decision." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004) (citation omitted). Rather, application of the standard requires this Court "to review 'the quality and quantity of the medical evidence and the opinions on both sides of the issues.'" *Glenn*, 461 F.3d at 666 (quoting *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)).

When determining whether a decision was arbitrary or capricious, this Court also factors in whether there "existe[d][ ] a conflict of interest," whether "the plan administrator[ ] fail[ed] to give consideration to the Social Security Administration's determination that [the applicant] was totally disabled," *id*., and whether the plan administrator based its decision to deny

-17-

benefits on a file review as opposed to conducting a physical examination of the applicant.  *Calvert v. Firstar Fin.*, Inc., 409 F.3d 286, 295 (6th Cir. 2005).  Such findings do not change the standard of review, but they do factor into the analysis when determining whether the administrator's decision was arbitrary or capricious.  *Id.* (conflict-of-interest context and file-review context); *Glenn*, 461 F.3d at 669 (failure to consider the SSA's determination of disability).

### B.  Reliance on the Surveillance Video

The plaintiff claims that MetLife improperly relied upon and characterized the surveillance video of the plaintiff.  This Court disagrees for several reasons.  First is MetLife's decision itself, as evidenced by the May 8, 2007 letter upholding its previous decision to terminate the plaintiff's long-term disability benefits.  This letter set forth the reasons for terminating benefits, and it is clear that the surveillance video played a part in that decision.  However, it was not the primary basis for the decision.  Second, Dr. Hollandsworth, the plaintiff's treating physician, opined that the plaintiff could not lift or carry anything and had limited use of his upper right extremity.  He further, opined that the plaintiff was unable to bend, stoop or reach above shoulder level.  In addition, Dr. Marshall  stated that the plaintiff was precluded from lifting anything above shoulder level. The video, however, clearly shows the plaintiff lifting objects above shoulder level with both arms.  It shows him carrying many things and placing them in the back of his truck.  It also shows him carrying a bag of dog food on his left shoulder and bending to feed his dog.  Based on this evidence, the Court cannot conclude that the defendants improperly relied upon the surveillance video.

### C.  Dr. Hollandsworth's Reports

The plaintiff also claims that MetLife failed to properly consider the reports of his

-18-

treating physician, Dr. Hollandsworth. First, the plaintiff claims that the May 8, 2007 letter indicates that Dr. Hollandsworth performed the FCE on February 5, 2007, and Alan Meade, P.T. actually performed the evaluation. However, the plaintiff did not dispute any of the findings of that FCE, and it is clear from the record that MetLife considered this information in making the determination of benefits. Second, the plaintiff claims that MetLife misread Dr. Hollandsworth's February 9, 2007 notes from his examination of the plaintiff because there is no indication that the exam was normal, as the May 8, 2007 letter suggests. The letter stated that Dr. Hollandsworth noted the examination was normal except for a tremor in the right upper extremity. The notes indicated these facts, and MetLife's statement in the letter was factually accurate. MetLife properly evaluated Dr. Hollandworth's reports. In addition, it is well-established that the defendant is not required to defer to the opinions of treating physicians, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003); it is equally clear that a plan administrator may not disregard those opinions, *see Evans*, 434 F.3d at 877. Here, the record shows that MetLife considered Dr. Hollandsworth's opinions.

### D. Dr. Gordon's Conclusions

The plaintiff argues that MetLife improperly relied upon the report of its consultative expert, Dr. Gordon. Further, he argues that the report is not supported by substantial evidence.

When assessing a non-treating physician's opinion, this Court may consider several factors, including: (1) whether the reviewing physician has a conflict of interest, *Moon*, 405 F.3d at 381-82; (2) whether the administrator decided that the physician should conduct a file review rather than a physical exam, particularly when it has the right to require a physical, *Calvert*, 409 F.3d at 295; and (3) whether the non-treating physician's conclusion makes a "critical credibility determination[ ] regarding a claimant's medical history and symptomology" without observing the

-19-

claimant, *id*. at 297.

The plaintiff first argues that Dr. Gordon's conclusion that there was an error in the diagnosis of RSD is not supported by the evidence, and MetLife should not have relied upon this finding. The plaintiff cited several instances in the record where RSD was mentioned. For example, Dr. Krein suspected RSD; however, no diagnosis was ever made. Dr. Hollandsworth's office confirmed that Dr. Hollandsworth never diagnosed the plaintiff with RSD, but he merely noted that the plaintiff reported that he had been so diagnosed. Further, Dr. Marshall's office confirmed that a diagnosis of RSD was something reported by the plaintiff himself.

Whether plaintiff had this particular condition, however, is not dispositive of the issue. The question is whether any medical condition rendered the plaintiff continuously and totally disabled from engaging in gainful work as defined by the plan. The plan placed the burden upon the plaintiff to provide MetLife with facts and information sufficient to prove that he met this definition. MetLife determined that plaintiff had failed to do so, and this Court cannot FIND that decision arbitrary or capricious based on MetLife's reliance on Dr. Gordon's conclusion that there was an error in the diagnosis of RSD.

Secondly, the plaintiff claims that Dr. Gordon's conclusion that the cervical degenerative changes did not impair the plaintiff is not supported by substantial evidence. In conjunction with this argument, the plaintiff argues that MetLife should have conducted an independent medical evaluation.

There is "nothing inherently objectionable about a file review in the context of a benefits determination." *Calvert*, 409 F.3d at 296. However, "the failure to conduct a physical examination–especially where the right to do so is specifically reserved in the plan–may, in some

-20-

cases, raise questions about the thoroughness and accuracy of the benefits determination." *Id*. at 295. In addition, "when a plan administrator's explanation is based on the work of a doctor in its employ, [this Court] must view the explanation with some skepticism." *Moon v. Unum Provident Corp.*, 405 F.3d 373, 381-82 (6th Cir. 2005). The fact that the plaintiff was not physically examined by an independent doctor, in and of itself, does not show that the defendant acted arbitrarily or capriciously. Further, MetLife, which employed Dr. Gordon, is not responsible for paying the benefits. Thus, no conflict existed. Moreover, the objective medical tests in the record reveal the plaintiff suffered from mild cervical spondylosis. Conservative treatment was recommended by the physicians. Based on this Court's review of the entire administrative record, there was sufficient evidence for Dr. Gordon's conclusions.

Finally, the plaintiff argues that MefLife should not have relied on Dr. Gordon's conclusion that the medical information indicated that the plaintiff was overreacting to his physical condition and that his physicians were overreacting to his complaints. Based on the evidence in the record, this Court cannot FIND that MetLife acted arbitrarily or capriciously in relying on this conclusion.

The evidence in the record shows that an upper extremity electrodiagnostic test conducted on December 9, 2004, showed normal results. At the time of the 2005 FCE, the plaintiff reported level three pain in his elbow. On examination, strength was normal, with good balance. Dr. Marshall's physical exam of the plaintiff revealed a stiffly held neck, with pain on motion, some paraspinal soreness, and right hand tremor during strength testing. Dr. Marshall diagnosed cervical spondylosis and facet arthopathy, with no major features of RSD. Upon this diagnosis, Dr. Marshall referred the plaintiff to physical therapy, and plaintiff decided not to go. Dr. Corradino associated

-21-

the plaintiff's symptoms of headaches and neck pain with mild cervical spondylosis that were amendable to conservative treatment. Dr. Marshall's notes dated February 17, 2006, indicate that a brain MRI revealed nothing more than incidental sinusitis. Dr. Marshall conducted additional electrodiagnostic testing on May 12, 2006, which revealed normal, unchanged results, and revealed no basis for plaintiff's complaints of increased pain. The plaintiff had reported knee pain as well, but upon examination, Dr. Marshall noted the knee was normal. Dr. Hollandsworth also examined the knee in June 2006, after plaintiff started using a cane, and found it to be normal. The plaintiff also complained of chest pains, and the adenosine cardiac stress test revealed normal results.

In September 2006, plaintiff complained to Dr. Marshall of a different low back pain and lower left extremity pain. The physical examination revealed nothing new. More objective tests in October 2006, February 2007, and March 2007 all showed normal or unchanged results despite complaints of increased pain. Based on the information in the record, this Court cannot conclude that Dr. Gordon's conclusion was incorrect. Furthermore, this Court cannot conclude that MetLife acted arbitrarily or capriciously for relying on this conclusion.

### E. The Determination Was Not Arbitrary or Capricious

Lastly, given the standard of review, the decision that the plaintiff was not entitled to long-term disability benefits under the plan is supported by substantial evidence in the administrative record. It was the result of a reasoned and deliberate process.

MetLife initially accepted the plaintiff's doctors' opinions as to his conditions and restrictions. However, after receiving the surveillance video and report, MetLife initiated a further

investigation of the plaintiff's claims. MetLife sought and received additional information from the plaintiff's doctors. Notably, Dr. Hollandsworth, who opined the plaintiff restrictions were permanent, declined to comment on the surveillance video. MetLife engaged Dr. Gordon to review the records, and MetLife then gave plaintiff's doctors another opportunity to offer opinions based on Dr. Gordon's conclusions. The record reflects that MetLife considered all medical evidence and opinions of the doctors.

Further, the medical evidence showed that the electrodiagnostic tests conducted after the plaintiff's initial injury in 2005 showed normal results. In February 2006, a cervical myleogram and CT scan were conducted, and the tests revealed no compression of any neurological structure. An MRI conducted that same month indicated normal results, except for sinusitis. In addition, other physical examinations during 2006 by both Dr. Hollandsworth and Dr. Marshall revealed plaintiff's knee to be normal. Other objective tests revealed normal results despite chest pain complaints. In October 2006, objective tests ruled out any basis that would explain the plaintiff's subjective complaints of pain, numbness, and weakness. The surveillance video showed the plaintiff carrying items, lifting items above shoulder level, and bending, all of which Dr. Hollandsworth or Dr. Marshall opined the plaintiff was restricted from doing. Furthermore, the 2007 PTE revealed that the plaintiff was capable of sedentary work, and in March 2007, Dr. Marshall placed the plaintiff on light duty restrictions. Based on the plan's requirements and evidence summarized above, this Court concludes that the decision to deny benefits was not arbitrary or capricious.

## III.   CONCLUSION

For the reasons stated above, this Court concludes that the plaintiff's motion for

judgment on the administrative record is **DENIED**. [Doc. 20]. The defendants' motions for judgment on the administrative record are **GRANTED**. [Docs. 16 and 18].

ENTER:

<u>s/J. RONNIE GREER</u>
UNITED STATES DISTRICT JUDGE